**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DWAYNE EUGENE BAKER (#R-29601), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 7668 |
| | ) | |
| GHALIAH OBAISI, Independent Executor of | ) | Judge Rebecca R. Pallmeyer |
| Estate of SALEH OBAISI, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Dwayne Eugene Baker, a prisoner at Stateville Correctional Center ("Stateville") in Illinois, brought this action under 42 U.S.C. § 1983 against Stateville doctors Saleh Obaisi, M.D.; Alma Martija, M.D.; and Stateville's former Assistant Warden Victor Calloway. Baker contends the Defendants were deliberately indifferent to a serious medical condition affecting Baker's wrist. Since the filing of this lawsuit, Martija and Calloway have been dismissed [79, 113], and after Dr. Obaisi died in 2017, his estate was substituted as a Defendant [90]. The estate now moves for summary judgment on Baker's claims [119].[1] For the reasons explained here, the motion is denied.

### BACKGROUND

The record in this case is messy and disputed.[2] The parties nominally contest almost every fact in each other's Local Rule 56.1 statements, and the court has prepared the following

---

[1]     This motion has been briefed for some time but was only recently reassigned to this court. (*See* Executive Committee Order [169].)

[2]     For one, Plaintiff filed exhibits to his Statement of Additional Facts ("SOAF") in groups, and some do not bear Bates numbers. Accordingly, the court uses ECF "PageID" numbers when citing to these exhibits, adding internal pagination or line numbers where, as in the case of depositions, such information is useful. For consistency, the court does the same when citing to the exhibits supporting Defendant's Rule 56 statements. The depositions referenced are as follows, with corresponding ECF Numbers: Deposition of Dr. Martija (one of Plaintiff's treating physicians at Stateville), Ex. A to SOAF (hereinafter "Martija Dep.") [139-1] at

factual account by relying on evidence in the factual record, whose contents include: Plaintiff's grievances, medical records, and his deposition; the depositions of two of Plaintiff's treating physicians (Dr. Martija at Stateville and Dr. Gonzalez at the University of Illinois at Chicago ("UIC")); depositions of and reports written by each party's medical expert (Dr. Michael Treister for Plaintiff, and Dr. Bruce Goldberg for Defendant); and more. (*See generally* Ex. List to Am. Rule 56.1(a)(3) Statements of Undisputed Material Facts [127].)[3] Notably, Dr. Obaisi was not deposed before his death in 2017.

## I. Treatment History and Procedural Background

Baker is a prisoner at Stateville. (Def. Ghaliah Obaisi, Independent Executor of Estate of Saleh Obaisi – Am. Rule 56.1 (a)(3) St. of Undisputed Material Facts (hereinafter "DSOF") [126] ¶ 1.) Beginning in the mid-2000s and continuing into the times relevant to this case, he has suffered from serious wrist pain. In 2007, Baker had developed a one-centimeter ganglion cyst on his wrist; he saw a doctor for the condition in 2008, and after that visit, it disappeared without treatment. (DSOF ¶ 38.) But the problem resurfaced in 2013, and Plaintiff saw Dr. Obaisi, Stateville's Medical Director, both that year and in an appointment on August 20, 2014 for the issue. (Dwayne Eugene Baker's Statement of Additional Material Facts (hereinafter "SOAF") [139] ¶ 1; Ex. Baker Dep. at 47:4–19, 56:15–19; Ex. C to SOAF (hereinafter "Martija Note") [139-

---

2292–2321; Deposition of Plaintiff, Ex. D to SOAF (hereinafter "Baker Dep.") [139-1] at 2327–2578; Deposition of Dr. Gonzalez (Plaintiff's hand specialist at UIC), Ex. BB to SOAF (hereinafter "Gonzalez Dep.") [139-6] at 2721–2814; Deposition of Dr. Goldberg (Defendant's medical expert), Ex. CC to SOAF (hereinafter "Goldberg Dep.") [139-6] at 2815–2840; and Deposition of Dr. Treister (Plaintiff's medical expert), Ex. EE to SOAF (hereinafter "Treister Dep.") [139-6] at 2843–2923.

[3]     The parties agreed that most of the record materials should be placed under seal [46], but such a practice is contrary to Circuit precedent. *See Duff v. Cent. Sleep Diagnostics, LLC*, 801 F.3d 833, 844 (7th Cir. 2015) (pointing out that "secrecy in judicial proceedings is generally disfavored"); *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); (noting that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view"). Accordingly, the court will direct the Clerk to lift the seal on all materials considered in connection with this motion. The court will stay this direction for 14 days, however, and invites the parties during that 14-day period to identify specific portions of the record that they believe should be redacted and kept under seal.

1] at 2326.)  At the August appointment, Obaisi ordered an X-ray of Baker's wrist, which showed "no visible bone or joint pathology."  (Baker Dep. at 97:20–23; *see also id.* at 58:20–59:7.)   But late that year, Baker returned, as more fully described below.

### A.    Plaintiff's November 2014 Appointment

Baker visited Dr. Obaisi again on November 18, 2014. (DSOF ¶ 6; SOAF ¶ 1.)  According to a grievance he filed later that day,[4] Baker sought Obaisi's treatment for an "unknown knot under [his] foot and some type of cyst growing on [his] wrist."   (Ex. B to SOAF (hereinafter "November 2014 Grievance") [139-1] at 2323.) The parties dispute what happened next.  It appears that Plaintiff's appointment was intended to address the growth on his foot, but that Baker raised the matter of his continuing wrist pain.  According to Baker, Obaisi told him "he wasn't going to do anything for [his] wrist" until he had treated Plaintiff's foot, which so angered Plaintiff that he "asked Dr. Obaisi in that meeting what type of doctor was he."  (Baker Dep. at 57:7–58:1, 86:8–15.) According to Plaintiff, Obaisi replied: "what do you mean what type of doctor am I, fuck your wrist and you, get the fuck out of here."  (November 2014 Grievance at 2324; *see also* Baker Dep. at 58:1–9, 103:1–2 ("Technically, he had out of his mouth, his specific words was fuck your wrist.").) At this point, "without examining [his] wrist or foot" or prescribing medication or a follow-up appointment, Dr. Obaisi told Baker "to leave the health care unit."  (November 2014 Grievance at 2324.)  Defendant admits that Obaisi saw Baker on that day, but denies he used the language

---

[4]    Defendant argues that Plaintiff's grievances constitute inadmissible hearsay and cannot be considered at the summary judgment stage.  At the summary judgment stage, the court considers evidence that "would be admissible at trial," and such evidence "need not be admissible in form, but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial."  *Wheatley v. Factory Card and Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016).  Given that Plaintiff was deposed in this case—and, during that deposition, testified consistently with his grievances—and, further, can testify from personal knowledge as to what he describes in his grievances, the court will rely on them as evidence in assessing Defendant's summary judgment motion.  Nor is there anything objectionable in the fact that some of these grievances are "self-serving."  *Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014).  Some information in the grievances is inadmissible on other grounds, of course, which the court recognizes in this discussion.

that Plaintiff attributes to him. (Def.'s Resp. to Pl.'s Statement of Additional Facts (hereinafter D's Resp. – SOAF) [149] at 2).  As noted earlier, however, Dr. Obaisi is deceased, and Defendant therefore has no evidentiary basis to rebut Plaintiff's account.  That the account is "self-serving" is not a basis for excluding it.

**B.**    **Plaintiff's Months-Long Effort to Get Approval to See a Specialist (November 2014–June 10, 2015)**

In the grievance he filed after his appointment, Plaintiff wrote that "[i]t's urgent that I see a doctor who is concerned about the medical problems I have, and is willing to help resolve the problem." (November 2014 Grievance at 2324.)  Plaintiff in fact saw Dr. Martija, a staff physician at Stateville,[5] on January 29, 2015 in an appointment that also turned heated.  (Martija Note at 2326.)  According to Martija's doctor's note, "[a]llegedly [Plaintiff's] hand/wrist is in pain." (*Id.*)  She noted that Plaintiff had seen Dr. Obaisi for the same reason back in November, but that Obaisi "determined it to be benign and plan was to f/u PRN."[6]  (*Id.*)  Because Plaintiff already had been approved to see an outside specialist for a cyst on his foot, Martija "told him to wait until he returns from [that] visit to see Dr. Obaisi [about his wrist]," in part to save Plaintiff the ($5) cost of an additional visit and in part because medications used to treat his foot cyst might also alleviate his wrist symptoms.  (*Id.*)  Baker, evidently unhappy with this suggestion, "got angry & was removed from premises by security." (*Id.;* Martija Dep. at 98:8–99:9.)

On the same day of his appointment with Martija, Plaintiff wrote a letter to Dr. Obaisi.  In it, he wrote, "I apologize if I insulted you in any type of way when I asked you what type of doctor was you.  But I really need to see you right away cause I lay around in pain 24/7 from this knot in

---

[5]      Dr. Martija described her role at Stateville, which lasted from July 2014 to July 2016, as "s[eeing] patients who had minor medical problems," and referring those she "thought needed a higher level of care" to Dr. Obaisi.  (Martija Dep. at 21:24–22:15.)

[6]      Though neither party defines "f/u PRN," the court takes it to mean "follow up" and *pro re nata*, or "as needed."  *See* Martija Dep. at 101:14–20; *prn*, MERRIAM-WEBSTER.COM (last visited Mar. 25, 2024), https://www.merriam-webster.com/dictionary/prn.

my foot, also from this knot in my wrist." (Ex. E to SOAF [139-1] at 2580.) He went on to explain that his wrist pain "keeps me from picking anything up, bending my hand backwards, and I often have to stop writing when I'm writing more than a page . . . ." (*Id.*) He also noted, "I have no type of pain meds to even try and relieve some of this pain, so I really need to see you about these 2 problems right away." (*Id.*) Around this time, Plaintiff also filed a grievance in which "he requested an MRI to evaluate the pain in his right wrist"—a diagnostic test that Dr. Michael Treister, Plaintiff's medical expert, later concluded was indeed "medically necessary to help alleviate Mr. Baker's wrist pain." (Ex. F (Part One) to SOAF (hereinafter "Treister Rep.") [139-2] at 2588; *see also* Ex. 8 to DSOF (hereinafter "Goldberg Rep.") [127-7] at 2095 (also noting that "Mr. Baker submitted to the prison a grievance form that he was not being sent for an MRI" around this time.)[7]

On March 13, 2015, Baker had his foot appointment with an outside specialist—a podiatrist named Matthew Keene at UIC—to address the plantar fibroma on his foot. (SOAF ¶¶ 8–9.) After that appointment, Dr. Keene wrote notes in a "Referral and Report" form summarizing the appointment and making two recommendations: first, that the mass on Plaintiff's foot be excised; and second, that Baker be sent to a hand specialist for his wrist cyst. (*Id.* ¶¶ 9–10; Ex. I to SOAF [139-4] at 2667.) Within a couple of days, Obaisi had officially approved Keene's recommendation that Baker's foot fibroma be removed. (SOAF ¶ 10.) Keene's recommendation that Baker see a hand specialist was ignored, however. (*Id.*)

While awaiting treatment recommended by Dr. Keene, Plaintiff continued to seek medical help for his wrist at Stateville. He saw a physician's assistant on March 16th, 2015 who noted that Baker reported that "it hurts to do anything" because of his wrist issue. (Ex. G to SOAF [139-4] at 2662.) Baker was then referred to Dr. Obaisi, who saw Baker on March 23. (DSOF ¶ 7; Ex. 9 to DSOF (hereinafter "IDOC Medical Records") [127-8] at 2131.) According to Obaisi's note

---

[7]     The court recounts both parties' expert reports in more detail below.

recounting that appointment, Baker spoke about his wrist pain and Obaisi prescribed him Mobic, an anti-inflammatory drug, for 90 days.[8]  (*Id.*)

Plaintiff had a follow-up foot appointment with Dr. Keene on May 29, 2015.  (SOAF ¶ 11.)  In the "Referral and Report," Keene once again remarked that Plaintiff "likely" had a "ganglion cyst" in his right wrist, and that he "w[ould] need w/u [workup]" with an "ortho/hand" specialist for the problem.[9]  (*Id.*; Ex. K to SOAF [139-4] at 2671.)  After this second request, on June 10, Obaisi approved Baker to see a hand specialist at UIC.  (SOAF ¶ 12.)  In a memorialization of that approval, a Wexford medical note reads "6-9-15 RCVD REQUEST FOR HAND CLINIC EVALUATION AT UIC – APPROVED BY DR. RITZ IN COLLEGIAL WITH DR. OBAISI FOR PT W/ GANGLION RIGHT WRIST."  (Ex. L. to SOAF [139-4] at 2673.)  Oddly, the bottom of that document bears a stamp stating "FAXED OCT 28 2015 . . . ."  (*Id.*)  Understanding the potential significance of that stamp first requires some detail as to the process for scheduling prisoners' appointments with outside specialists, described below.

---

[8]    Mobic is a brand of meloxicam, a nonsteroidal anti-inflammatory drug that treats arthritis symptoms.  *Meloxicam*, Mayo Clinic (last updated Mar. 1, 2024), https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/side-effects/drg-20066928?p=1.  Plaintiff appeared to be on various similar pain medications at different times throughout 2014 and 2015, including Naprosyn, Tylenol, Motrin, and Methocarbamol.  (DSOF ¶ 6.)  Neither party points to record evidence tying these medications specifically to Plaintiff's wrist pain (as opposed to his foot fibroma, at which Plaintiff claims the medications were targeted).  Nor does the record clarify the timing (that is, when Plaintiff was taking which medication).  It appears that in January 2016, Plaintiff's medication was switched from Motrin to Naprosyn because Motrin "was not helping" him with the pain he had (whether from his wrist or otherwise was unspecified).  (DSOF ¶ 8.)

[9]    Plaintiff's expert explained that ganglion cysts "are the result of synovial fluid which is produced by inflamed synovial tissues at the intra-carpal or wrist joint levels."  (Treister Rep. at 2587.)  The cysts vary in size over time and can "spontaneously disappear."  (*Id.*)  Additionally, they often need not be removed "[u]nless [they] push on nerves and/or tendons, or restrict movements by virtue of their size . . . ."  (*Id.*)  When symptomatic, they are "commonly removed," but because they frequently recur, some doctors avoid surgical intervention.  (*Id.*)

### C. Scheduling Plaintiff's Specialist Appointment After its Approval (June 2015– July 26, 2016)

The (admissible) record evidence sheds some light on how Stateville prisoners were supposed to be scheduled for appointments with outside specialists. An Administrative Directive from the Illinois Department of Corrections ("IDOC"), (Ex. AA to SOAF (hereinafter "IDOC Administrative Directive") [139-6] at 2715–20), explained the process the following way.[10] If a physician determined that a referral was "medically necessary," they were supposed to submit a "Medical Special Services Referral and Report" to the Medical Director. (*Id.* at 2716.) The Medical Director would then review the referral and determine whether to follow through with it; if the Director approved the referral, he would "submit [it] to the Utilization Management Unit of the facility's health care vendor," in this case, Wexford Health Sources,[11] either "in writing or verbally through a collegial review."[12] (*Id.*) The vendor's Utilization Management Unit ("UM Unit") would then review the approval and "submit a written response" to the Medical Director within five working days. (*Id.* at 2717.) In the event of approval from the UM Unit, the Directive states that the "Facility Medical Director shall ensure services are scheduled and the course of treatment is initiated." (*Id.*) The same section of the Directive concerning scheduling separately states that "[i]f approved, health care staff shall schedule the pending specialty service." (*Id.*)

---

[10] Defendant repeatedly cites to this directive in its objections to Plaintiff's Statement of Additional Facts while simultaneously claiming, without citation to cases or the Federal Rules of Evidence, that Plaintiff cannot rely on the Directive because he cannot "lay proper foundation" for it. (*See* D's Resp – SOAF at 7, 9, 10–12, 14, 15–18.) As Defendant itself cites the report, its objection to Plaintiff's own citation to the document is overruled.

[11] Wexford Health Sources, Inc. is a company that contracted to provide the medical care at Stateville and other Illinois prisons. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 221 (7th Cir. 2021) (describing Wexford as "a private corporation that contracts with Illinois to provide healthcare to Illinois inmates.").

[12] In other words, a "collegial" in this context means a review and sign-off of one doctor's treatment decision by another. *See Dean*, 18 F.4th at 221 (describing Wexford's "collegial review" policy as "requir[ing] Wexford's corporate office to preapprove offsite care").

Whether and to what extent these directions were followed by Stateville's medical staff is unclear. For example, at times in her deposition, Dr. Martija claimed to not know how scheduling occurred. (Martija Dep. at 84:9–24.) At other times, she agreed that Dr. Obaisi, as the Medical Director, was responsible for ensuring that specialty consults were scheduled "and the course of treatment was initiated." (*Id.* at 54:8–11.) At one point, Martija claimed that scheduling of these consults was handled by a woman named Inca, apparently Stateville's then-Medical Records Director, but went on to say "[b]ut that's not really part of her job description. I think she does it. I don't know why." (*Id.* at 54:12–22.) And in his deposition, Baker testified that a woman named Amanda—whose last name he did not know—was the scheduling coordinator for prisoners' appointments at UIC around the summer of 2015. (*See* Baker Dep. at 197:16–198:21.) According to Baker, "Amanda d[id] the scheduling, and Dr. Obaisi, it's up to the medical director and Amanda to come up with the scheduling process." (*Id.* at 198:1–2.)

Whatever the procedure for scheduling one, Plaintiff's appointment continued to elude him. After the June approval, months passed without update. By September 17, Plaintiff had filed a grievance claiming that he was being denied proper medical treatment. (Ex. M to SOAF [139-5] at 2675.) The Grievance Officer's Report privately noted, in response to this complaint, that Baker "has been approved but no date yet." (*Id.*) Then, on September 23, Dr. Obaisi appears to have seen Baker after Baker had a seizure; at that appointment, Dr. Obaisi increased the dose of an anti-seizure medication. (IDOC Medical Records at 2135). And in a portion of the note recounting Baker's requests during that appointment, Obaisi acknowledges that "offender . . . has not been called for ortho consult previously approved [for his] ganglion" cyst. (*Id.*) Baker would also claim in his deposition that, at this appointment, Obaisi "picked up the phone and called somebody because he said he didn't understand why they didn't ever send me out. . . . I don't know what transpired on the telephone or what happened or none of th[ose] things, I don't know, but he picked up the phone and called somebody." (Baker Dep. at 206:5–16.)

However, non-action continued. Plaintiff wrote Stateville's Assistant Warden of Operations, Nicholas Lamb, on October 14, 2015, to complain that he was "being denied medical treatment" because "for over a year now I have had this cyst on my wrist that has to be surgically removed" and that "I was finally approved for the outside hospital in . . . 2015 . . . and I still haven't been sent to get this cyst removed." (Ex. N to SOAF [139-5] at 2677.) He continued, noting that he "sit[s] around all day in pain because nobody here at the jail even followed up with 'UIC' to make me an appointment." (*Id.*) Then, in a letter dated November 2, the Warden wrote Baker that "[y]ou have been approved for an outside evaluation" and that "another request for a date has been made recently. Once a date has been scheduled you will be taken to that evaluation." (Ex. O to SOAF [139-5] at 2679.)

It is unclear whether Lamb's reference to "another request" referred to the call Obaisi allegedly made after Baker's September 23 appointment or something else. Plaintiff suggests, instead, that the request for a date actually occurred in late October, after Warden Lamb received Baker's October 14th letter. Plaintiff appears to rely on some curious timing: as noted above, the June 10, 2015 Wexford UM Unit document confirming approval of Baker's hand-specialist appointment appears to have been faxed somewhere months later, on October 28, 2015, right after Baker complained to the Warden about not being scheduled for an appointment (on October 14) and before the Warden's letter claiming that another appointment request had recently been made (on November 2). (*See* Ex. L. to SOAF [139-4] at 2673 (the approval); Ex. N to SOAF [139-5] at 2677 (Baker's letter to the Warden); Ex. O to SOAF [139-5] at 2679 (the Warden's response).) There appears to be no evidence in the record that explains where such a document might have been faxed that October, whether faxing would be the means by which an appointment would be requested, or at whose direction the document was faxed. Nonetheless, inferring in Plaintiff's favor, the court notes that these documents could perhaps be read to suggest that the relevant Stateville official responsible for requesting Plaintiff's appointment—whether Dr. Obaisi

9

or somebody else—never did so after Obaisi (and Wexford) approved it in June, and only took action in October, after Plaintiff's entreaty to the Warden.

Even after November 2, however, Plaintiff continued to wait. He had an appointment with Obaisi on November 17, 2015, in which he claimed in a later grievance he "made the medical director aware that I am having the same problem and still haven't been sent to the outside hospital for treatment even though I was approved months ago." (Ex. P to SOAF [139-5] at 2681.) According to Baker, Obaisi responded by saying that Baker should have been sent to a specialist and he would be seen shortly. (*Id*.) Additionally, in his doctor's note memorializing that appointment, Obaisi, for the first time, noted that something other than a ganglion cyst might be the cause of Plaintiff's pain—specifically, he wrote "tendinitis v. ganglion [cyst] . . . ." (Ex. DD to SOAF [139-6] at 2842.)

Months continued to pass without progress. Plaintiff continued waiting for an appointment for consultation with a hand specialist. (Ex. P to SOAF [139-5] at 2681.) So, when Plaintiff saw Obaisi again on March 24, 2016, he yet again complained about the problem with his wrist and the fact that, since June of the previous year, he had been approved but never scheduled for an outside consultation. (Ex. 9 to DSOF [127-8] at 2137.) This time, Obaisi "made referrals to see [an] orthopedic specialist[] on . . . March 29, 2016." (DSOF ¶ 32.) And a Wexford UM record indicates that, by March 30, 2016, an appointment was on the books:

> 3-30-2016: Received request for ortho eval. This p[atient] was previously approved for a hand clinic evaluation at UIC in 6/2015. During collegial, Dr. Ritz and Dr. Obaisi were informed that the p[atient] has an appointment with the hand clinic at UIC on 7/27/2016. Dr. Ritz and Dr. Obaisi were okay with keeping this appointment. P[atient] has a ganglion cyst on his R wrist. . . . AUTH FOR ORTHO EVAL AT UIC . . . .

(Ex. R to SOAF [139-5] at 2686.) But it appears that no one shared this information with Plaintiff, who wrote a grievance a month later stressing that he "was approved a year ago to go to the outside hospital to see a hand-specialist to have this knot/cyst removed from off my wrist" and that his "several grievances" and repeated complaints to prison officials had been ignored. (Ex.

S to SOAF [139-5] at 2688.)  He claimed that "the Medical Director . . . has [not] given me any follow-up appointments, or setup a date at 'U.I.C.' for me to see the hand specialist."  (*Id.* at 2688–89.)

### D.     Plaintiff Begins Receiving Specialty Care (July 2016)

At last, on July 26, 2016—over a year and a half after his November 2014 complaint to Dr. Obaisi—Baker was taken to UIC for an appointment with Dr. Mark Gonzalez, an orthopedic hand surgeon.[13]  (DSOF ¶ 14.)  In his doctor's note, Gonzalez reported the following:

> The patient is a 33-year-old male with history of right wrist pain for 2 years.  He visited an orthopedic surgeon last year [14] and he has been told that he has a right wrist ganglion cyst.  Nothing was recommended at the time, and the patient continued to bear the pain.  He rates his pain about 4–5 today.  The pain is not constant.  It comes and goes, sometimes it wakes him up from sleep. . . .
>
> An x-ray of the right wrist was obtained in the office today. . . . [N]o evidence for fracture or dislocation.
>
> The patient and Dr. Gonzales [sic] had an extensive discussion about the future plan.  The patient voiced understanding and agreement with the plan, which is to proceed with physical therapy three times a week for a time of 8 weeks, and take Aleve 400 mg [thrice daily] . . . for pain control and inflammation.  The patient will come back in the office for reevaluation in 6 months.  The patient voiced understanding and agreement with the plan.

(Ex. T to SOAF [139-5] at 2691–92.)  Other than physical therapy, Dr. Gonzalez's treatment plan broadly resembled the care that Plaintiff had already received.  In this vein, in his deposition, Gonzalez explained that ganglion cysts are "benign and a lot of people leave them alone and do fine with it."  (Gonzalez Dep. at 12:19–20.)  He noted that he himself had had a ganglion cyst for eighteen years, and that he would occasionally have the cyst drained and it would simply resurface.  (*Id.* at 12:13–17.)  He clarified, however, that, though "a cyst can just be cosmetic and most cases it is," the story changes "[i]f they become painful . . . ."  (*Id.* at 12:6–12.)

---

[13]     It is unclear from the record why the appointment occurred a day before the date listed in the abovementioned Wexford document referencing the appointment.

[14]     Presumably, this refers to Dr. Keene, the podiatrist who saw Plaintiff for his foot fibroma.

Plaintiff's follow-up appointment with Gonzalez did not in fact occur within six months of his July appointment, as Gonzalez had recommended. Instead, it took some seven months before Plaintiff was approved for a follow-up appointment to be scheduled, and then another six months before the appointment itself. (SOAF ¶¶ 25–26.) Both medical and legal developments would occur in the interim.

### E. Plaintiff Files His Lawsuit and Gets Counsel (July 2016–January 2017)

Around the time of his July 26th appointment with Dr. Gonzalez, Plaintiff wrote his first complaint in this case, alleging that he "has been approved to go to the outside hospital since June 9, 2015 and nobody has sent me to 'U.I.C.' to see the hand specialist to have this knot/cyst removed." (Compl. [1] at 12.) The complaint—which was file-stamped on July 28, 2016, two days after his appointment with Gonzalez—alleged deliberate indifference under 42 U.S.C. § 1983 against Dr. Obaisi and Dr. Martija, as well as numerous wardens and assistant wardens (both former and current) at Stateville. (*See id.* at 1–3, 5.) Baker simultaneously filed a motion seeking attorney representation (*see* Mot. for Attorney [4]), and the court recruited an attorney to represent him on September 6, 2016 (Ord. [5] at 1). Around the same time, Plaintiff was still complaining of wrist pain. (*See* Treister Rep. at 2590.)

A few months later, in early January 2017, Plaintiff's counsel filed an amended complaint naming Dr. Obaisi, Dr. Martija, and Victor Calloway (a former assistant warden at Stateville). (Am. Compl. [24].) The amended complaint alleged specifically that "[f]rom November 2014 to July 2016," the defendants were deliberately indifferent to Baker's medical needs by delaying and denying him care "despite knowledge of his serious medical condition." (*Id.* ¶ 1.)

### F. Scheduling Plaintiff's Follow-up Appointment at UIC and Treatment of his Wrist (February 2017–April 2018)

In the winter of 2017, Plaintiff moved closer toward scheduling a second meeting with Dr. Gonzalez. On February 16, 2017, Baker saw Dr. Obaisi for an appointment, and Obaisi wrote in his notes that he would seek approval for the follow-up in a collegial review with a Wexford

physician.  (Ex. U to SOAF [139-5] at 2695.)   On February 21, Obaisi met with a Wexford

physician, noting that Baker had been seen six months earlier, and received Wexford's approval

for the appointment.  (Ex. V to SOAF [139-5] at 2697; Ex. W to SOAF [139-5] at 2699.)

Plaintiff was sent to UIC for his follow-up appointment with Dr. Gonzalez on August 15,

2017.  (SOAF ¶ 26.)  The appointment was similar to the first one, which had occurred more than

a year earlier, in that Gonzalez noted that Plaintiff reported "right wrist pain for the last 3 years,"

that "[h]e has seen an orthopedic surgeon previously and he was told he has a right wrist ganglion

cyst with nothing recommended at the time," and that "he continues to have pain in the dorsum

of the wrist," including "shooting pains," significant enough to wake him from sleep.  (Ex. W to

SOAF [139-5] at 2700–01.)  Gonzalez also remarked that Plaintiff "reports there was a mass on

the dorsum of the wrist that does enlarge and shrink," and that "[c]urrently, it is very small."  (*Id.*

at 2700.)

This time, Gonzalez prescribed a different course of treatment; he wrote that he "would

like [Baker] to obtain an MR arthrogram of the right wrist to evaluate possible causes to see if a

ganglion might be the cause."[15]  (*Id.* at 2701.)   In his deposition, Gonzalez explained that "if I just

---

[15]        An arthrogram is "[i]maging of a joint following the introduction of a contrast agent
into the joint capsule to enhance visualization of the intraarticular structures."  *Stedmans Medical
Dictionary* 75970, Westlaw (database updated Nov. 2014).  The parties do not describe what
"MR" refers to, but it appears that Plaintiff had an arthrogram of the wrist as well as an MRI.  (*See*
Treister Rep. at 2590 (noting that "[a]n MRI was made on the same day" as the arthrogram).)
More specifically, Dr. Goldberg, Defendant's expert, explained the procedure the following way:

> So there's two things that the injection of dye does when you do an arthrogram.
> One, you're still getting an MRI.  So you're still getting the MRI.  And then you inject
> the dye.  And the dye both is injected into a space and you see if it transverses or
> flows into other spaces that it shouldn't be in, like a TFCC [triangular fibro-cartilage
> complex] tear.  Or it outlines other structures that you can't see.  So now you're
> looking at a negative image.  So the contrast around the ligament now defines the
> ligament in -- if you will, if you're looking at a negative image, so you now see this
> space that should be ligament that's thickened.  You're not actually seeing the
> ligament itself.  You're seeing the shape of the ligament because the dye has
> bathed the ligament.  So it gives another level of information on the tissues that
> aren't specifically defined by the MRI.

want to look for a ganglion, I would not get an arthrogram," and that the arthrogram's usefulness would extend beyond identifying types of cysts to "looking for [intra-articular] pathology." (Gonzalez Dep. at 26:11–19.)

In late December 2017, as Baker awaited his arthrogram (and as discovery in this lawsuit was ongoing), Dr. Obaisi died. (Suggestion of Death of Saleh Obaisi, M.D. Upon the Record Pursuant to Fed. R. Civ. P. 25(A)(1) [64].) And on January 17th, 2018, just weeks later, Baker had the MR-arthrogram. (Ex. X to SOAF [139-5] at 2703–06.) The procedure turned up more problems than a simple ganglion cyst. According to Dr. Treister, Plaintiff's expert, the procedure showed: a two-centimeter ganglion cyst; [16] a "cyst in the radial aspect of the carpal lunate bone (near the scapho-lunate junction)"; a "[p]artial tearing of the scapho-lunate ligament"; a "[p]artial tearing of the . . . triangular fibro-cartilage complex"; "[p]artial cartilage loss . . . of the proximal pole of the scaphoid bone"; "[e]xtensive synovitis in the right wrist and inter-carpal joint areas"; "[c]omplete articular cartilage loss in the scapho-trapezial joint"; and "a longer than usual distal ulna . . . ." (SOAF ¶ 29.) Dr. Gonzalez testified that Plaintiff's two-centimeter cyst was "[p]retty big" in comparison to others he had seen. (Gonzalez Dep. at 65:3–18.) But the arthrogram revealed a mixture of problems plaguing Plaintiff's wrist, including partial ligament tears, cartilage loss, synovitis (that is, "inflammatory tissue"), and a cyst. (*See* Gonzalez Dep. at 54:20–62:3 (describing findings and speculating that Plaintiff's wrist pain was probably largely caused by the scapho-lunate ligament tear and nearby cartilage loss).

Plaintiff's wrist thus suffered from more significant issues than the ganglion cyst Dr. Obaisi and others had assumed was the cause of his pain. According to Dr. Treister, Plaintiff's expert, the arthrogram disclosed a "considerable right wrist pathology in the wrist joint, around the

---

(Goldberg Dep. at 56:6–23.)

[16]    In one instance, Treister's report erroneously refers to the cyst as being one centimeter, while radiologist notes and other portions of Treister's report describe the cyst as being two centimeters large. (*Compare* Treister Rep. at 2586–87, *with* Ex. X to SOAF at 2706.)

scaphoid, lunate, and trapezoid bones, and an associated large synovial cyst (ganglion), very likely secondary to the aforementioned wrist pathologies, on the volar aspect of the wrist joint." (Treister Rep. at 2590.)  The "bulk of th[is] pathology hides out of clinical sight" and is thus only visible with arthrograms and other similar procedures.  (*Id.*)  Elaborating, Treister concluded that the "observed [ganglion] cyst . . . clinically was the 'tip of the iceberg,'" and that the "cause of wrist pain in Mr. Baker was, much more likely than not, from the extensive pathology deep in his wrist and not from the size-variable easily observed and superficial protruding dorsal extension of the deeper synovial cyst . . . ."  (*Id.* at 2591.)   Treister characterized these pathologies as "osteoarthritis."  (*Id.* at 2588.)

At a follow-up appointment in March 2018, after Baker's arthrogram, Dr. Gonzalez recommended that Baker undergo a "right wrist arthroscopy[17] in April" to investigate and address the assortment of wrist problems observed during the procedure.  (Ex. Z to SOAF [139-5] at 2713; SOAF ¶ 30.)  Gonzalez told Baker at that appointment that they would "likely repair the TFCC [triangular fibro-cartilage complex]," as well as the "scapholunate ligament."  (Ex. Z to SOAF [139-5] at 2713.)  Though they would "begin arthroscopically," Gonzalez told Baker that he "may need to have an arthrotomy[18] and open repairs of some of these things" down the road.  (*Id.*)  And Gonzalez warned Baker that, though the procedure would be beneficial, "he may not get 100% pain relief from the procedure," largely due to potentially permanent "scaphoid cartilage damage . . . ."  (*Id.*)

The procedure occurred on April 26, 2018.  (Ex. Y to SOAF [139-5] at 2709.)  Exploring Baker's wrist, Gonzalez discovered "some synovitis throughout the entire wrist," including near

---

[17]    An arthroscopy is an "[e]ndoscopic examination of the interior of a joint."  *Stedmans Medical Dictionary* 76380, Westlaw (database updated Nov. 2014).   In his deposition, Dr. Gonzalez explained that "arthroscopy is just a look at the inside technically," but that during the procedure, "if there's something that surgically we can do to fix things, debride things, to treat it, we would go ahead and do that simultaneously."  (Gonzalez Dep. at 33:23–34:14.)

[18]    An arthrotomy is a procedure involving "[c]utting into a joint to expose its interior." *Stedmans Medical Dictionary* 76450, Westlaw (database updated Nov. 2014).

the "TFCC," as well as "fraying of the scapholunate ligament" and "some cartilage loss in the proximal pole." (*Id.*) In response, Gonzalez and the surgical team "inserted [a] shaver and debrided the scapholunate ligament partial tear," and also "debrided some of the scaphoid cartilage and . . . debrided the TFCC until synovitis was clear." (*Id.* at 2710.) They also drained "excess fluid from the joint." (*Id.*) According to Plaintiff's expert, "much of Mr. Baker's right wrist pain abated after the arthroscopic intervention at" UIC. (Treister Rep. at 2591.)

### G. Contemporaneous Litigation Developments (2018–Present)

As Baker's wrist healed, this litigation continued. The parties stipulated to Calloway's dismissal in June of 2018. (Minute Entry [81].) Near the end of that month, the court granted Plaintiff's motion to substitute Ghaliah Obaisi, the Independent Executor of Dr. Obaisi's estate, as Defendant (*see* Ord. [90]), and discovery was completed during the summer of 2019 (s*ee* Minute Entry [109]). Then, in August 2019, the parties entered two additional stipulations. The first was that "Plaintiff will not assert, as a basis for liability, that Dr. Obaisi's failure to send medical records to Plaintiff's treating physicians at the University of Illinois Medical Center constituted deliberate indifference to Plaintiff's serious medical needs." (Stipulation Regarding Pl.'s Deliberate Indifference Claim [112].) The second was a stipulation dismissing Dr. Martija from the suit. (Stipulation of Voluntary Dismissal of Def. Alma Martija, M.D. Pursuant to FED. R. CIV. P. 41(a)(1)(A)(ii) [113].) Defendant filed the motion for summary judgment at issue here on September 9, 2019. (Mot. by Def. Ghalia Obaisi for Summ. J. [119].)

## II. Expert Reports

Both parties hired medical experts to opine on Mr. Baker's condition and the treatment he received between 2014 and 2018. Because disputes concerning their conclusions occupy a significant amount of space in the briefing, the court (briefly) recounts each expert's take on Baker's wrist condition and how it was treated.

Dr. Michael Treister, Plaintiff's expert, is a board-certified orthopedic and hand surgeon. (Treister Rep. at 2585.) Treister opined that Baker's osteoarthritis was "more likely than not

present as of November 2014 when Mr. Baker first began complaining of severe pain in his right wrist." (*Id.* at 2588.) And according to Treister, the condition deteriorated "exponentially," causing worse symptoms, including severe pain, and thus rendering delays in Baker's treatment consequential in exacerbating his condition. (*Id.* at 2588, 2592.) Because the condition was progressive, Treister also concluded that Baker was "likely to have future problems with his right wrist" notwithstanding the "significant relief" he felt after his 2018 surgery. (*Id.* at 2592.)

Treister also drew on Plaintiff's medical records, grievances, and other evidence to opine on—and broadly criticize—the treatment Plaintiff received. Treister opined that Obaisi's medical treatment fell "below the acceptable standards of medical care," in his alleged altercation with Plaintiff in November 2014, in his failure to investigate the cause of Plaintiff's wrist pain more seriously, and in his delays in getting Plaintiff to see a specialist. (*Id.* at 2588, 2591–93; DSOF ¶ 20.) In sum, Treister claimed that, save for the occasional use of anti-inflammatories, "Mr. Baker had no reasonable medical care for the conditions which existed in his right wrist" for the long period before Plaintiff began seeing Dr. Gonzalez. (*Id.* at 2592; Treister Dep. at 304:15–18 (admitting that the phrase "no reasonable care" was "a little bit of an error" because anti-inflammatory drugs were not inappropriate prescriptions).) Treister, however, did not ascribe malicious intent to Obaisi. (DSOF ¶ 21.) He also agreed at turns that the prescription of medications was a reasonable—if partial—way to address Plaintiff's pain. (*Id.* ¶¶ 9, 12, 16.)

Predictably, Defendant's expert—Dr. Bruce J. Goldberg, also an orthopedic surgeon—drew different conclusions. (Ex. 6 to DSOF (hereinafter "Goldberg Rep.") [127-7] at 2092.) For one, Goldberg downplayed the severity of Baker's wrist condition. To Goldberg, Baker's wrist condition simply was "not an urgent or emergent condition that requires treatment" because most ganglion cysts are harmless. (*Id.* at 2099.) When asked during his deposition about the significance of Obaisi's noting, in November 2015, the possibility Baker had either a ganglion cyst or tendinitis, Goldberg observed that tendinitis, too, is a non-urgent condition that could be treated with "activity modification, simple medications, perhaps a brace or a cast . . . to immobilize the

wrist . . . ."  (Goldberg Dep. at 51:11–17; DSOF ¶ 62.)[19]  In other words, Baker's wrist condition "at no time presented a serious risk of harm to Mr. Baker," and "any pain he may have been experiencing was well controlled at all times" by pain medications.  (Goldberg Rep. at 2099.)  Goldberg also disputed the extent (and regularity) of Plaintiff's pain and Treister's conclusion that his osteoarthritis was present as of 2014.  (Id. at 2095, 2099.)

Goldberg also had little if anything critical to say about the treatment Baker received.  In Goldberg's view, Dr. Obaisi and other Stateville doctors met the standard of care by prescribing the various pain medications they gave Plaintiff and by largely observing the cyst and seeing whether it resolved over time.  (Id. at 2095, 2097.)  Nor, in Goldberg's view, was there any indication "that Mr. Baker required any form of advanced imaging" prior to receiving the arthrogram in August 2017, let alone that he required such imaging urgently.  (Id. at 2095–96.)  In drawing this conclusion, Goldberg stressed that Dr. Gonzalez—an orthopedic surgeon trained in hand surgery—himself did not order these tests during Baker's first appointment with him in July 2016.  (Id.)  To Goldberg, Dr. Obaisi had no reason to "suspect" from 2013 until his death in 2017 that Baker suffered from the pathologies discovered once these tests were done.  (Id.)  And finally, Goldberg concluded that delays in Baker's seeing a specialist was neither consequential nor was it the fault of Obaisi or the Stateville officials.  Dr. Goldberg asserted that he saw "no medical evidence that Wexford Health Sources, Inc ever delayed or denied specialty care" and instead claimed that "[s]cheduling was done by UIC."  (Id. at 2099.)  And he concluded that "[t]here is no medical evidence any perceived delay in orthopedic referral, advanced imaging or surgical intervention caused, contributed to or exacerbated Mr. Baker's intra-articular pathology."  (Id. at 2097, 2098.)

---

[19]  As far as the court can tell, Dr. Obaisi never immobilized Plaintiff's wrist or otherwise instructed him to modify his activity.

**DISCUSSION**

**I.    Legal Standard**

A court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" *Lord v. Beahm*, 952 F.3d 902, 903 (7th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), and the substantive law dictates which facts are material, *Anderson*, 477 U.S. at 248.  In deciding whether to grant summary judgment, the court must "construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) (citing *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009–10 (7th Cir.1999)).  Both the moving and nonmoving parties may raise objections "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

**II.    Preliminary Issues**

Before turning to the merits of Plaintiff's deliberate indifference claim, the court addresses several ancillary issues Defendant raised in briefing.

**A.    How Dr. Obaisi's Death Affects Plaintiff's Case**

Defendant argues that Obaisi's death impacts this case in two ways:  First, though the briefing is not entirely clear, Defendant appears to argue that Obaisi cannot be liable for any of Plaintiff's future wrist-related medical needs that post-date Obaisi's passing.  (Mem. by Ghaliah Obaisi in Supp. of Summ. J. (hereinafter "MSJ") [128] at 2–3; Reply by Ghaliah Obaisi to Mem. in Supp. of Motion (hereinafter "Reply") [148] at 8.)  Second, Defendant argues that Plaintiff cannot seek punitive damages against Obaisi's estate.  (MSJ at 15.)  As discussed below, the court rejects the former argument but accepts the latter.

### 1.     Liability for Post-Mortem Harm

In support of summary judgment, Defendant argues that "[a]ny claimed violation of inmate Baker's rights was extinguished upon Dr. Obaisi['s] death on December 23, 2017."  (MSJ at 2.) Elaborating, Defendant claims that the violation of a prisoner's rights "can only continue for as long as the defendant has the power to do something about the prisoner's condition."  (*Id.* (citing *Heard v. Sheehan*, 253 F.3d 316, 318 (7th Cir. 2001)).)  Though the briefing is unclear, as best as the court can tell, Defendant appears to be making an argument about damages—essentially claiming that Obaisi's death prevents his estate from being held liable for any harm that Plaintiff suffered related to the wrist injury after December 23, 2017.  (See Reply at 8.)

Section 1983 allows a plaintiff to recover damages proximately caused by the defendant's wrongdoing. *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999) ("Ordinarily, to obtain an award of compensatory monetary damages under § 1983, a plaintiff must demonstrate both that he has suffered an 'actual' present injury and that there is a causal connection between that injury and the deprivation of a constitutionally protected right caused by a defendant.")  Accordingly, in this case, Obaisi can be liable for harm caused by actions he took while alive, even if he was not there to see the damage he had done.  To the extent that Obaisi's treatment decisions and delay caused Plaintiff's pain and the exacerbated wrist injury discovered during his 2018 surgery, he can be liable notwithstanding his death.  In this sense, Defendant's argument misses the mark.

One caveat bears mentioning.  Plaintiffs may not receive damages for a mere "increased risk of incurring a future serious injury caused by a defendant's deliberate indifference to that risk . . . ."  *Id.* This principle applies to situations as in *Henderson* where the defendant exposed the plaintiff to a toxin (there, secondhand smoke), which increased the risk that the plaintiff might develop a disease down the road.  *Id.* at 848–49.  This case is not like those cases; Plaintiff's claim is that Obaisi's deliberate indifference exacerbated his wrist pathology such that he required greater surgical intervention than otherwise would have been required and also extended the duration of his wrist pain.  Those harms already exist, and a jury might find that they were

proximately caused by Obaisi's actions in the years before his death.  Obaisi's death thus has no obvious effect on Plaintiff's compensatory damages recovery.

### 2.    The Availability of Punitive Damages

The conclusion differs with respect to punitive damages: punitive damages are recoverable under Section 1983 "even in the absence of actual damages where the jury concludes that the defendant's conduct was 'motivated by evil intent or involv[ed] reckless or callous indifference to the federally-protected rights of others.'"  *Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001) (quoting *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1299 (7th Cir.1989)).  The purpose of awarding punitive damages is to "punish [the defendant] for his outrageous conduct," as well as to "deter him and others like him from similar conduct in the future."  *Heidelberg v. Manias*, 503 F. Supp. 3d 758, 800 (C.D. Ill. 2020) (quoting *Smith v. Wade*, 461 U.S. 30, 54 (1983) (alteration in original)).

But as Defendant observes, punitive damages are ordinarily no longer available when the wrongdoer has died.  When a defendant is deceased, imposing punitive damages does not serve the ends of punishment or deterrence.  *See Flournoy v. Est. of Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 18, 2020) (refusing to allow punitive damages in similar situation, as "imposing punitive damages on Obaisi's estate would not serve" the ends of unique punishment and individual deterrence); *Heidelberg*, 503 F. Supp. 3d at 800 (collecting cases drawing the same conclusion).  Plaintiff stresses that other doctors may be deterred by the imposition of punitive damages here, and stresses that "compensation and deterrence" are prominent purposes of § 1983 litigation.  (Resp. by Dwayne Baker in Opp. to Mot. by Def. Ghaliah Obaisi for Summ. J. (hereinafter "Pl.'s Resp. – MSJ") [135] at 19–20 (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267–68 (1981)).)  But "other forms of deterrence already exist to prevent state officials from committing constitutional torts," including the possibility of liability and the commitment that most such officials have to their public duties.  *Kahlily v. Francis*, No. 08 C 1515, 2008 WL 5244596, at *6 (N.D. Ill. Dec. 16, 2008).

21

In other words, the court is not convinced that imposing punitive damages on a deceased doctor's estate is justified merely because there is some theoretical possibility that, down the road, it might dissuade a different prison doctor considering maliciously inflicting pain on a prisoner. Accordingly, the court grants summary judgment to Defendant on the question of punitive damages.

**B.      Admissibility of the *Lippert* Reports**

In his summary judgment opposition, Plaintiff relies in part on two expert reports (the "*Lippert* Reports") generated in a separate case, *Lippert v. Ghosh*, No. 10-cv-4603, Dkt. Nos. 339 & 767-5. The reports were generated pursuant to the parties' agreement in that case to have an independent expert "determin[e] whether [IDOC] is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy." *Id.* Dkt. No. 244. The resulting reports were highly critical of both Dr. Obaisi specifically and Stateville's medical care more generally. For example, the first report concluded that Obaisi's "primary care skills" appeared to be "not up to date" and that he "d[id] not provide clinical oversight for [Stateville's] program." (Ex. FF to SOAF [139-7] at 2927, 2930.) The second report found that Stateville physicians were frequently ignorant of care guidelines for common medical problems, took inadequate histories for patients, and performed inadequate physical exams. (Ex. GG to SOAF [139-8] at 2972.) It found that specialty care at UIC was often untimely. (*Id.*) It also concluded that, "[b]ased on record reviews, the quality of physician care, particularly care provided by the recently deceased Medical Director [Obaisi], was substandard," in part due to his being a surgeon and "not appear[ing] to know how to manage many primary care problems, resulting in harm to patients." (*Id.* at 2976.)

Defendant argues that these reports would be inadmissible at trial and therefore cannot be treated as evidence at summary judgment. The court agrees, at least at this stage of the proceedings. In deciding a motion for summary judgment, the court may only consider evidence that "would be admissible at trial," either in form or substance. *Wheatley*, 826 F.3d at 420.

Therefore, Plaintiff may rely on the *Lippert* Reports in opposing summary judgment only if those reports would be admissible at trial.

On that score, the Seventh Circuit has explicitly held that the *Lippert* reports are inadmissible hearsay when introduced to prove the truth of their allegations, because they are not authenticated, they are not public records, and the residual hearsay exception does not permit their admission. *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019). Indeed, it appears from the court's research that every court to have considered the matter has refused to admit these reports. *Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, at *5 (N.D. Ill. Apr. 24, 2017) (collecting cases).

In this case, too, the *Lippert* Reports *are* hearsay (Plaintiff offers the reports' allegations about Obaisi's poor medical care and other medical-care failures at Stateville for their truth), and the reports do not fall within the exception for "public records" under Rule 803(8), or to any other recognized exception to the hearsay rule. *See Mathis v. Carter*, No. 13 C 8024, 2017 WL 56631, at *4–5 (N.D. Ill. Jan. 5, 2017) (finding that *Lippert* Report did not fall within the public records exception because it was not a "record or statement of a public office").

Plaintiff tacitly acknowledges as much by arguing that the *Lippert* Reports, even if inadmissible hearsay, can nonetheless be considered because Plaintiff's expert relied on them in drawing his conclusions. True, the Federal Rules of Evidence allow experts to rely on otherwise inadmissible evidence in drawing their conclusions "[i]f experts in the particular field would reasonably rely on those kinds of facts or data" to inform their conclusions. FED. R. EVID. 703. However, when the evidence on which an expert reasonably relies is otherwise inadmissible, "the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.* And as Defendant points out, even in these latter cases, "the judge must make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence." *Matter of James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) (citing *Gong v. Hirsch,* 913 F.2d 1269, 1272–73 (7th Cir.1990)).

In this case, to help a jury evaluate his opinion, it may be that Dr. Treister could offer testimony that relies on *certain* parts of the *Lippert* Reports. But to admit the *entire* reports on this basis—let alone the list of the reports' conclusions Plaintiff seeks to introduce at this stage— would fall far closer to the impermissible practice of using Rule 703 as a backdoor to sneak inadmissible evidence into a trial. For this reason, the court avoids discussing them at this stage and will defer ruling on whether any portions of the reports are admissible at trial. With these preliminary issues addressed, the court turns to the meat of the parties' dispute.

## III. Baker's Deliberate Indifference Claim

Prison officials' "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment and thus "states a cause of action under § 1983." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Not "every claim by a prisoner that he has not received adequate medical treatment" rises to the level of a constitutional violation, however. *Id.* Instead, courts perform a two-step test to determine whether the plaintiff has proven deliberate indifference in violation of the Eighth Amendment: first, whether "plaintiff suffered from an objectively serious medical condition"; and second, "whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). While the former prong of the test is objective, the latter prong revolves around the defendant's "subjective state of mind." *Id.* at 728.

Defendant does not dispute that Plaintiff suffered from an objectively serious medical condition. (*See* Reply at 3 ("Plaintiff goes on for fourteen pages restating facts and arguing the undisputed position that Plaintiff's medical condition was objectively serious.") Accordingly, the court focuses on the second, subjective prong of the deliberate indifference test.

To establish the subjective element of a deliberate indifference claim, a plaintiff must show that the defendant "knew of facts from which he could infer that a substantial risk of serious harm existed, and that he did, in fact, draw that inference." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (citing *Farmer*, 511 U.S. at 837). Put differently, a plaintiff must

24

prove that the defendant "*actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728 (emphasis in original). Accordingly, though "a plaintiff does not need to show that the official intended harm or believed that harm would occur" to meet this standard, a showing of "mere negligence is not enough." *Id.*

Though this is a high bar, the Seventh Circuit has pointed out "[t]he difficulty . . . that except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge." *Id.* This means that "[m]ost cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Id.* Such circumstantial evidence can include:

> the obviousness of the risk, the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment.

*Thomas v. Martija*, 991 F.3d 763, 768 (7th Cir. 2021) (quoting *Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019)). Furthermore, "inexplicable delays in treatment where the delays serve no penological purpose" can serve as circumstantial evidence of deliberate indifference. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Petties*, 836 F.3d at 730).

Defendant makes three main arguments in support of summary judgment: first, that Obaisi rendered adequate care to Plaintiff; second, that even if the care he provided was substandard, evidence in the record at most implied that it was negligent as opposed to deliberately indifferent; and third, that any delays in Plaintiff's seeing a hand specialist were not Obaisi's fault.

Plaintiff contends there are disputes of fact on all of these issues. He stresses, first, that Obaisi openly expressed deliberate indifference through his statements to Plaintiff at their November 2014 appointment; and second, that there remain factual disputes about whether Obaisi knowingly (and unnecessarily) delayed Plaintiff's visits to a specialist in the face of clear evidence that alternative treatment methods were not relieving his pain.

### A.      The November 2014 Appointment

"A prison official's decision to ignore a request for medical assistance" is the "most obvious" circumstance evincing deliberate indifference. *Id.* at 729 (citing *Estelle*, 429 U.S. at 104–05). This includes ignoring or otherwise not treating a prisoner such that "he experience[s] prolonged, unnecessary pain as a result of a readily treatable condition." *Gomez v. Randle*, 680 F.3d 859, 865–66 (7th Cir. 2012) (reversing dismissal of deliberate indifference claim where doctors promised to provide medical supplies to prisoner who had a wound he worried would get infected, but did not give him that treatment until four days later).

Plaintiff has offered evidence that his requests were ignored. First, he testified, consistent with assertions he made in contemporary grievances, that during his November 2014 appointment with Dr. Obaisi, Obaisi kicked him out of the appointment without examining or providing pain medication for Plaintiff's wrist, and said some variant of "fuck your wrist and you." (November 2014 Grievance at 2323; *see also* Baker Dep. at 58:1–7, 103:1–2.) Defendant disputes this, but Dr. Obaisi himself is no longer alive, and Baker's testimony, however implausible it may be, is unrebutted. If Dr. Obaisi did make the comments attributed to him, such language is an explicit invocation of deliberate indifference—a rarity in such litigation. *See Petties*, 836 F.3d at 728 ("Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!'"). Moreover, a reasonable jury could pair evidence of this alleged statement with other record evidence to find that Obaisi deliberately ignored Plaintiff's wrist condition despite knowing that Plaintiff was in serious pain. Plaintiff reports he complained about his wrist pain during that appointment. (*See* November 2014 Grievance at 2323–24.) And there is evidence that Plaintiff had seen Obaisi complaining of wrist pain at least twice before this November appointment in 2013 and 2014. So, even if Obaisi later treated Plaintiff appropriately, and even if "this delay did not exacerbate [Plaintiff's] injury," a jury could reasonably conclude that by refusing to treat him at that appointment—with no apparent follow-up for months—Obaisi knowingly prolonged Plaintiff's pain. *See Gomez*, 680 F.3d at 865–66; *see also Conley v. Birch*, 796 F.3d 742, 747

(7th Cir. 2015) (reversing grant of summary judgment where doctor prescribed plaintiff ibuprofen for multiple days before she returned from vacation, with the knowledge that his hand was in serious pain and potentially broken). In other words, the evidence of Plaintiff's past appointments for wrist pain in 2013 and 2014, paired with Obaisi's comment and refusal to treat him in November 2014, could lead a jury to conclude that Obaisi knew Plaintiff was in pain and deliberately ignored it.

### B.    Obaisi's Delays

In addition to Obaisi's comments during their November 2014 appointment, Plaintiff points to two periods during which he alleges Obaisi delayed referring him to a specialist while knowing that Plaintiff harbored a serious medical condition in his wrist. First, Plaintiff points to the eight-month gap between November 2014 and June 2015, at which point Obaisi approved him to see a hand specialist. Secondly, Plaintiff points to the fact that he waited more than a year after that approval before actually seeing Dr. Gonzalez in July 2016, and then experienced more delays before a follow-up appointment with Dr. Gonzalez. Slightly different issues arise concerning each delay, as set forth below.

Circumstantial evidence of deliberate indifference can arise when "a prison official persists in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 729–30 (citing *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000)). This includes when "a prison doctor chooses an 'easier and less efficacious treatment' without exercising professional judgment . . . ." *Id.* (quoting *Estelle*, 429 U.S. at 104 n.10). A jury may also rely on context clues to determine whether a doctor knew that he was providing "deficient treatment," including "evidence that the patient repeatedly complained of enduring pain with no modifications in care . . . ." (*Id.* at 726, 731.) As one such failure to modify care, an " 'inexplicable delay' in responding to an inmate's serious medical condition can reflect deliberate indifference." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (quoting *Petties*, 836 F.3d at 731). This is "especially" true when "that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Id.* (citing

*Williams v. Liefer*, 491 F.3d 710, 715–16 (7th Cir. 2007)).  Accordingly, the court must deny summary judgment if there is direct or circumstantial evidence from which a jury could reasonably conclude that Obaisi, knowing of the risk of harm to Baker, delayed approving or sending him to a specialist, and that this delay prolonged Baker's pain or exacerbated his wrist condition.  The court discusses two potentially relevant delays below.

### 1.    Delay in Approving a Specialist Appointment

Plaintiff complained of serious pain both before and after his November 2014 appointment. He complained of wrist pain to Dr. Martija in January 2015, and wrote a letter to Obaisi that same day stating that "I really need to see you right away cause I lay around in pain 24/7" as a result of his wrist and foot problems.  (Ex. E to SOAF at 2580.)  The pain was significant enough to wake him from sleep, keep him from picking things up or bending his hand, and from extensive handwriting, and he noted that he had "no type of pain meds to even try and relieve some of this pain . . . ."  (*Id.*)  Around that time, he also requested that he receive an MRI to determine the cause of his wrist pain.  (Goldberg Rep. at 2095.)  And soon after, in mid-March, Dr. Keene—the outside specialist Plaintiff saw for his foot—recommended that Plaintiff be referred to a hand specialist.  (SOAF ¶¶ 8–10.)

There is evidence that Obaisi ignored that recommendation and appears to have done nothing for Plaintiff's wrist pain between November 2014 and March 23, 2015, when he prescribed Plaintiff Mobic for ninety days.  (DSOF ¶ 7.)  And it was not until June, after Dr. Keene recommended for a second time that Plaintiff see a hand specialist, that Obaisi finally approved the referral.  Inferring in Plaintiff's favor, a reasonable jury could conclude that Obaisi knew that Plaintiff's wrist was causing him enough pain to keep him up at night and prevent him from doing numerous quotidian tasks, yet not only refused to prescribe pain medication for months, but also ignored repeated requests for additional care (Plaintiff's own request for an MRI and Dr. Keene's recommendation).

*Thomas v. Martija*, a recent and similar case, proves instructive. There, a prisoner, Michael Thomas, had broken his hand in 2011 and, for years, had been given a "low bunk" permit to keep him from incurring hand pain when climbing into a high bunk to sleep. 991 F.3d at 766–67. After that permit expired in August 2014, Thomas met with Stateville doctors in October 2014 and both "asked them to renew the low-bunk permit" and "submitted formal requests through the prison's grievance system for a referral to an orthopedic specialist for lingering complications from the same hand injury." *Id. a*t 767. Thomas had an appointment in January 2015 with Dr. Obaisi about a different medical issue, during which he repeated these hand-related requests, but Obaisi neither renewed the permit nor referred him to a specialist until June 2015, five months later. *Id.* Reversing a grant of summary judgment in favor of Obaisi, the Seventh Circuit noted that the months-long delay "would allow a factfinder to conclude that Dr. Obaisi was aware of Thomas's continuing pain from the hand and consciously and needlessly delayed both measures." *Id.* at 769. Plaintiff Baker's case maps well onto *Thomas*: as in that case, Plaintiff (and Dr. Keene) requested specialty care or referrals, Plaintiff complained repeatedly of serious pain, and Obaisi delayed both the prescription of pain medication and the referral to an outside specialist.

Of course, Obaisi's treatment decisions and refusal to heed a podiatrist's recommendation of referral may well have been appropriate and considerate care. But there are genuine disputes about this. A reasonable juror could pair Obaisi's allegedly sluggish response to Plaintiff's wrist complaints with his alleged statement during their November 2014 appointment—"fuck your wrist and you"—and conclude that Obaisi understood Plaintiff's wrist condition was serious enough to warrant intervention (either pain medication or specialty care) and nonetheless dragged his feet for non-medical reasons. This use of circumstantial evidence—inferring that doctors' earlier statements infected their later actions—finds support in the caselaw. In *Petties*, for example, the Seventh Circuit explained that a doctor's statement that surgery would be "too expensive" could reasonably support the inference that the same doctor's later treatment decisions were "dictated by cost . . . rather than medical judgment." 836 F.3d at 733. The same principle applies here. A

29

jury could infer that, in the face of Plaintiff's repeated complaints of severe pain, Obaisi's months-long delay in prescribing Mobic, or his even longer refusal to approve Plaintiff to see a specialist, were dictated not by medical judgment but by animosity.

In sum, viewed in the light favorable to Plaintiff, there is evidence that Obaisi knew Plaintiff harbored severe wrist pain and needed specialty care, but for non-medical reasons refused to budge on his treatment regimen, unnecessarily prolonging Plaintiff's pain. This is sufficient to survive summary judgment.

### 2.    Delay in Scheduling Specialist Appointments

Finally, Plaintiff points to the delays in scheduling the first and second appointments with Dr. Gonzalez after Obaisi's June 2015 approval. Here, Plaintiff stresses that the Administrative Directive concerning scheduling outside consultations for prisoners states that the Medical Director "shall ensure services are scheduled and the course of treatment is initiated" once the appointment is approved by Wexford's UM Unit (which, for Plaintiff's first appointment with Dr. Gonzalez, occurred in June 2015). (IDOC Administrative Directive at 2717.) He also points out that, between his June 2015 approval and his July 2016 appointment, Plaintiff repeatedly complained about serious pain in his wrist, including in grievances, letters, or at appointments in September, October, and November 2015, as well as March 2016. In November 2015, Obaisi saw Plaintiff and recorded a doctor's note suggesting that he understood tendinitis—as opposed to a ganglion cyst—might be causing Plaintiff's pain, but did not change his treatment regimen of over-the-counter pain pills. Then, it was not until Plaintiff's March 2016 complaint—after many months of complaining of severe pain—that Obaisi scheduled him for the July appointment with Dr. Gonzalez. Finally, Plaintiff notes that Obaisi appears to have ignored Dr. Gonzalez's request for a six-month follow-up after Baker's first appointment with him in July 2016, instead failing to even request the follow-up appointment until seven months later.

Drawing inferences in his favor, this evidence could support a finding that the delay between June 2015 (his approval) and March 2016 (when his appointment was actually

30

scheduled, for July), was the product of knowing, deliberate indifference on Obaisi's part. Again, a recent case proves instructive. In *Goodloe v. Sood*, the Seventh Circuit reversed the district court's grant of summary judgment in a prison doctor's favor where the doctor had "resorted not to taking a step to be certain [the plaintiff] saw an outside specialist, but instead continued" a topical treatment for the plaintiff's rectal pain that plaintiff insisted "was providing no relief" for that pain. 947 F.3d 1026, 1031 (7th Cir. 2020). In reaching this decision, the court stressed that plaintiff had "complained in no uncertain terms" in a grievance he filed about his pain and the ineffective nature of the treatment he was receiving, and that "[t]he complaint prompted no action, no renewed effort to arrange for the outside consultation [the defendant doctor] had decided two weeks earlier was medically necessary. A jury could find that there was no medical justification for the delay." *Id.* at 1032 (citing *Petties*, 836 F.3d at 730–31).

Here, similarly, Plaintiff repeatedly complained of pain and demanded that the prison make good on his pre-approval to see a specialist. In September, he filed a grievance report about being denied proper treatment, to which the Grievance Officer responded by acknowledging that he "has been approved but no date yet." (Ex. M to SOAF at 2675.) That date remained elusive; Plaintiff complained again a month later in a letter to the warden, both about his pain, about the need for surgery for his wrist, and that he had been approved for a specialist with no appointment made. (Ex. N to SOAF at 2677.) Additionally, Obaisi appeared to recognize in November 2015 that Plaintiff's painful wrist issue was possibly more complicated than a ganglion cyst, and yet no official word of an appointment with a specialist appeared until after Plaintiff complained once again in March of 2016. A jury could take the fact that these repeated requests and Obaisi's evolving understanding of Plaintiff's wrist condition did not produce an appointment date—let alone a prompt appointment date—as evidence that Obaisi did not make a genuine effort to resolve Plaintiff's suffering.

It is true, as Defendant argues, that there is some evidence that Obaisi did renew efforts at scheduling Plaintiff's appointment in response to his complaints. For example, Plaintiff testified

that he understood Obaisi made a "call" after their September 2015 appointment about scheduling the specialty consult (Baker Dep. at 206:5–16); that the warden implied that a new "request" had been made for the appointment after Plaintiff's October letter (Ex. O to SOAF at 2679); and that Obaisi told him that he should have been sent to the specialist and that the appointment would happen soon (Ex. P to SOAF at 2681). But whether these efforts occurred or were genuine or enough is a factual matter for a jury. *See Thomas*, 991 F.3d at 770–71 (in similar case concerning delays in referrals and scheduling appointments, noting that "[a]ll this is to say that there are facts that need to be resolved").

### C.      Defendant's Counterarguments

Defendant argues that these factual disputes are insufficient to defeat summary judgment for four reasons. The court explains below why it concludes otherwise.

#### 1.      Whether Negligence is Dispositive

First, Defendant at times claims that the fact that Plaintiff's expert concluded that Obaisi's care was merely negligent—as opposed to intentionally malicious—is "dispositive testimony" in Defendant's favor. (MSJ at 4–5.) In this vein, Defendant repeatedly stresses that Dr. Treister refused to ascribe malicious intent to Obaisi, testifying "of course not" when asked in his deposition whether Obaisi was "intentionally negligent." (MSJ at 4; Reply at 2 (quoting Treister Dep. at 303:2–5).)

Dr. Treister's conclusion in this regard is significant. Much of his opinion would support a conclusion that Dr. Obaisi was negligent and that the care he provided fell below acceptable standards—but "plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference." *Petties*, 836 F.3d at 728 (citing *Estelle*, 429 U.S. at 106). In other words, if Obaisi's care was merely sub-standard, it would not constitute deliberate indifference. That said, sub-standard care—care that could expose Obaisi to medical malpractice liability—may *also* "rise to the level of deliberate indifference" if the circumstances show that Obaisi "did not just slip up, but was aware of, and disregarded, a substantial risk of harm." *Petties*, 836 F.3d at 728.

In any event, Treister is an expert on a physician's treatment decisions, not his state of mind; and other evidence in the record raises triable issues of fact as to whether Obaisi knew that the care he was giving exposed Plaintiff to a serious risk of harm. The Seventh Circuit has "rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 679 (7th Cir. 2023) (quoting *Petties*, 836 F.3d at 731). As *Arce* explained, a plaintiff can establish deliberate indifference either by showing that a doctor's treatment decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* (quoting *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019)). Alternatively, "even if a defendant eventually pursues an acceptable course of treatment," that doctor "still may violate the Eighth Amendment if she is deliberately indifferent to an unjustifiable delay that 'exacerbated the inmate's injury or unnecessarily prolonged his pain.'" *Id.* (quoting *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015)). As already explained, evidence in the record raises triable issues of fact as to whether Obaisi knew that the care he was giving exposed Plaintiff to a serious risk of harm or prolonged his pain.

### 2. Adequate Treatment

Defendant notes that Dr. Gonzalez prescribed similar treatment—anti-inflammatories and physical therapy—after Plaintiff's first appointment with him, arguing that this shows that the risk of serious harm was not obvious. If the wrist pathology was not obvious to Gonzalez, the argument goes, Plaintiff has failed to show any inadequacy or constitutional deficiency in the (similar) care Obaisi had employed until then. Again, this is evidence that may be persuasive to the jury. But a jury could also conclude that, unlike Dr. Gonzalez, Obaisi had seen Plaintiff repeatedly and understood that his wrist pain was severe and ongoing, and, at least as of November 2015, that a ganglion cyst may not be its cause.

Put differently, Plaintiff has done enough here to raise a triable issue of fact as to whether Obaisi knew that something more than pain medication was necessary to treat Plaintiff's condition, but nonetheless dragged his feet in initiating specialty care. Moreover, Dr. Gonzalez's treatment plan did differ from Obaisi's insofar as he recommended physical therapy. And more importantly, Dr. Gonzalez ramped up treatment on Plaintiff's second visit, when he saw that pain medications were not working. Had Plaintiff never seen the specialist, then, it is not at all clear that Obaisi would have ordered the MR arthrogram Dr. Gonzalez eventually conducted. Viewed in Plaintiff's favor, a jury could reasonably conclude that the delay in getting that process started, in the face of Plaintiff's obvious and frequent complaints of pain, constituted deliberate indifference notwithstanding the initial similarity in the two doctors' treatment plans.

### 3. Whether Treatment Delays Caused Plaintiff's Injuries

Similarly, Defendant argues that any delay in Plaintiff's treatment was irrelevant because "there is no causal relationship between any alleged delays and any alleged injuries to Plaintiff." (Reply at 6.) Defendant cites to *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008), which implies that, to show deliberate indifference from a delay in treatment, a plaintiff needs to proffer "verifying medical evidence" that the delay worsened his medical condition. But Plaintiff *has* proffered such evidence: Plaintiff's medical expert opined that his wrist condition was "more likely than not present as of November 2014 when Mr. Baker first began complaining of severe pain in his right wrist," and that it would deteriorate "over time" and "accelerate[] exponentially . . . as the disease status becomes worse." (Treister Rep. at 2588.) In other words, evidence in the record could lead a jury to conclude that some of Plaintiff's wrist issues could have been prevented with earlier intervention. Secondly, as noted above, a delay need not actually worsen Plaintiff's medical condition to amount to deliberate indifference if it unnecessarily prolonged serious pain. *See Gomez*, 680 F.3d at 865–66.

### 4.    Questions Related to Control Over Appointment Scheduling

Finally, Defendant points to confusion in the record about who controls Stateville's appointment-scheduling process to argue that any delay was not Obaisi's fault.  Here, Defendant relies in part on *Walker*, in which the Seventh Circuit noted that "the plaintiff must show that the defendant's actions or inaction caused the delay in his treatment."  940 F.3d at 964.[20]  Defendant is right that the record points in different directions on this question.  On the one hand, some evidence suggests that Obaisi controlled the process:  the Administrative Directive claims that Obaisi, the Medical Director, must ensure that specialist appointments are made once approved, and Obaisi "made referrals to see [an] orthopedic specialist" in late March, 2016, after Plaintiff's repeated complaints, and which resulted in a scheduled appointment the following day.   (IDOC Administrative Directive at 2717; Ex. R to SOAF at 2686.)  However, other evidence suggests that the scheduling delays were the fault of other individuals, including the Medical Records Director or other healthcare staff.  (*See* IDOC Administrative Directive at 2717 (noting that "health care staff shall schedule the pending specialty service"); Martija Dep. at 54:12–22; Baker Dep. at 197:19–198:3.)

But the fact that evidence points in different directions means that summary judgment is inappropriate.  As the Seventh Circuit put it in *Thomas*:

> All this is to say that there are facts that need to be resolved. It is enough for now that there is evidence supporting two possibilities: either that Dr. Obaisi was deliberately indifferent to [Plaintiff's] needs and caused this delay, or that administrative issues beyond his control were to blame. Moreover, one cannot blame the orthopedists for delays before June 2015, when Dr. Obaisi initiated the referral process.

---

[20]    The parties spent time in separate briefing arguing as to whether *Walker v. Wexford*, 940 F.3d 954, created "new law" or law retroactively applicable to this case. (*See* Reply at 3–4; Sur-Reply by Pl. Eugene Baker to Reply [152] at 2–3; Sur-Reply by Def. Ghaliah Obaisi [153] at 1–2.)  It is unclear to the court exactly where their dispute lies, but the parties appear to agree that *Walker* is "precedential" and thus bears on this case. (*See* Sur-Reply by Def. Ghaliah Obaisi at 1–2.)

991 F.3d at 770. Broader still, a jury could conclude that as the Medical Director, Dr. Obaisi had the authority—and responsibility—to ensure that other medical staff made the appointments in a timely manner, and he failed to do so with knowledge of the consequences that failure risked having on Plaintiff. Defendant's argument thus misses the mark.

<u>**CONCLUSION**</u>

A reasonable jury could view the entirety of the evidence amassed in this case—including the statements Obaisi allegedly made to Plaintiff in November 2014, his refusal to prescribe pain medications at that appointment, the delay in approving Plaintiff to see a specialist, and the delay in scheduling Plaintiff's first and second appointments with that specialist—as suggesting his deliberate indifference to Plaintiff's serious pain, or a serious slate of wrist conditions. For these reasons, Defendant's motion for summary judgment [119] is denied.

ENTER:

Dated: March 27, 2024

_____
REBECCA R. PALLMEYER
United States District Judge